**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| YAAKOV MARKEL, | No. 23-55088 |
| *Plaintiff-Appellant*, | D.C. No. 2:19-cv-10704-JWH-SK |
| v. | |
| UNION OF ORTHODOX JEWISH CONGREGATIONS OF AMERICA, a corporation; NACHUM RABINOWITZ, an individual; DOES, 1-100, | OPINION |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Central District of California
John W. Holcomb, District Judge, Presiding

Argued and Submitted April 3, 2024
Pasadena, California

Filed December 30, 2024

Before: Ryan D. Nelson, Lawrence VanDyke, and Gabriel P. Sanchez, Circuit Judges.

Opinion by Judge R. Nelson;
Concurrence by Judge Sanchez

# SUMMARY[*]

## First Amendment Ministerial Exception

The panel affirmed the district court's summary judgment in favor of the Union of Orthodox Jewish Congregations of America (OU) and Rabbi Nachum Rabinowitz, holding that the First Amendment's ministerial exception barred plaintiff Yaakov Markel, whom UO formerly employed as a mashgiach to supervise food preparation for kosher compliance, from bringing employment-related claims.

The OU is organized as a not-for-profit corporation whose mission is to serve the Orthodox Jewish community. It runs the largest kosher certification program in the United States, and the program provides most of OU's revenues. The district court held that OU is a religious organization and that a mashgiach is a "minister" within Orthodox Judaism. Markel's employment-related claims, therefore, were categorically barred by the First Amendment's ministerial exception, which precludes the application of "laws governing the employment relationship between a religious institution and certain key employees."

The panel agreed with the district court that the ministerial exception categorically barred Markel's employment-related claims because UO is a religious organization and a mashgiach is a minister. The acceptance of revenue does not deprive an organization with a religious mission of First Amendment protections. Here, OU was

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

organized to support the Orthodox Jewish Community, its activities primarily serve this purpose, and it holds itself out to the public as religious. Markel's role was essential to OU's religious mission. Because only observant Orthodox Jews can serve as a mashgiach for the OU, and because they are necessary to carrying out OU's religious mission of ensuring the wide availability of kosher food, a mashgiach is a minister for purposes of the ministerial exception.

The panel rejected Markel's argument that the ministerial exception was inapplicable because his dispute involved only secular issues. A religious institution's decisions, even if facially secular, are often intertwined with religious doctrine. Moreover, a religious organization need not provide any religious justification to invoke the ministerial exception. Finally, the panel held that given the broad purpose of the ministerial exception, it protects a religious organization's supervisors and religious leaders from claims brought by ministerial employees.

Concurring in part and concurring in the judgment, Judge Sanchez agreed that the ministerial exception applied under the facts of this case. As a head mashgiach who ensured the kosher certification of grape products, Markel's work was essential to the spiritual mission of UO. Because Markel qualified as a minister, his claims challenging UO's tangible employment actions were barred under the ministerial exception. Judge Sanchez did not join Section III.C of the opinion or the majority's conclusion that the Supreme Court has taken a broad view of who counts as a minister. This case did not require the panel to adopt either a broad or narrow view of the ministerial exception or to wade into questions about whether a court can differentiate between "secular" or "religious" decisions. To the extent the majority suggests that the ministerial exception also bars

non-employment-related claims brought by a ministerial employee, that view is at odds with both Supreme Court and circuit precedent.

## COUNSEL

Michael E. Friedman (argued) and Steven R. Friedman, Friedman² LLP, Los Angeles, California, for Plaintiff-Appellant.

Leonora M. Schloss (argued), Jackson Lewis PC, Los Angeles, California; Dylan B. Carp, Jackson Lewis PC, San Francisco, California; James P. Carter, Jackson Lewis PC, Irvine, California; for Defendants-Appellees.

Daniel J. Feith, Gordon D. Todd, Alaric R. Smith, and Aaron P. Haviland, Sidley Austin LLP, Washington, D.C.; Nicholas R. Reaves, Yale Law School, Free Exercise Clinic, Washington D.C.; for Amicus Curiae the International Society for Krishna Consciousness.

# OPINION

R. NELSON, Circuit Judge:

We review the district court's holding that the First Amendment's ministerial exception applies to a *mashgiach*—an Orthodox Jew who supervises food preparation to ensure kosher compliance. Because the Union of Orthodox Jewish Congregations of America is a religious organization and a *mashgiach* is a minister, we affirm.

## I

The undisputed evidence, with the facts construed in the light most favorable to Plaintiff Yaakov Markel, are as follows. From 2011 to 2018, Markel, an Orthodox Jewish man, worked for the Union of Orthodox Jewish Congregations of America (OU) as a *mashgiach*. A *mashgiach* is "an inspector appointed by a board of Orthodox rabbis to guard against any violation of the Jewish dietary laws"—colloquially known as "keeping kosher." *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 301 (4th Cir. 2004) (quotation marks omitted).

OU is organized as a 26 U.S.C. § 501(c)(3) not-for-profit corporation, and its mission is to serve the Orthodox Jewish community. It supports a network of synagogues, providing religious programming, advocacy, and youth programs. One of OU's primary activities in service to its member synagogues is ensuring that kosher food is widely available. To that end, it runs the largest kosher certification program in the United States. That program provides most of OU's revenues. It uses those revenues to support its youth, teen, and educational programming, and to further its core

religious mission of serving the Orthodox Jewish community.

A team administers OU's kosher program. The team includes *poskim* (preeminent scholars on Jewish law); senior administration; rabbinic coordinators; *mashgichim* (the plural of *mashgiach*), such as Markel; and rabbinic field representatives. Markel was responsible for the kosher integrity of grape products at two wineries, and thus served OU's kosher team. Grape products are unique in Jewish dietary law because—to be kosher—only Orthodox Jews can handle them until they are *mevushal* (sufficiently cooked or boiled). To qualify to serve as a *mashgiach*, Markel needed to submit a letter from an Orthodox rabbi certifying that he was Sabbath observant, knowledgeable about kosher law, and compliant with the same. If Markel had questions about Jewish law, he would often (though not always) ask *poskim* for instruction and direction.

After several years, Markel's relationship with OU soured. Markel claims that his supervisor, Rabbi Nachum Rabinowitz, promised him a promotion and a raise. He allegedly received neither. He also claims that OU withheld from him certain compensation for overtime. OU, in turn, denies that Markel was denied any owed compensation.

Markel resigned and filed suit, bringing wage and hour and fraud and misrepresentation claims against both OU and Rabbi Rabinowitz (collectively Appellees). Appellees moved for summary judgment, invoking the ministerial exception. As a matter of first impression—at least in this circuit—the district court held that a *mashgiach* is a "minister" within Orthodox Judaism and that OU is a religious organization. *Markel*, 648 F. Supp. 3d at 1190–96. Given this, the district court held that Markel's claims—

including those brought against Rabbi Rabinowitz—were categorically barred by the ministerial exception because they were employment related. *Id.* at 1195–96. Markel appealed.

## II

We review a grant of summary judgment de novo. *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1029–30 (9th Cir. 2004). Summary judgment is appropriate when "there is no genuine dispute [of] material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III

The First Amendment prohibits any "law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I. The Religion Clauses collectively "protect[] the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 737 (2020) (*Our Lady*) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)). From this general principle of church autonomy stems the "ministerial exception," which precludes the application of "laws governing the employment relationship between a religious institution and certain key employees." *Id.*

The ministerial exception "protect[s] [a religious institution's] autonomy with respect to internal management decisions," which includes the "selection of the individuals who play key roles." *Id.* at 746. "[A]ny attempt . . . to

dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion." *Id.* Thus, the Religion Clauses require deference to a "religious institution's explanation of the role of [its] employees in the life of the religion in question." *Id.* at 757. As a result, "it is impermissible for the government to contradict a church's determination of who can act" as one of these mission-critical employees. *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 185 (2012). "[C]ourts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Our Lady*, 591 U.S. at 746.

By its terms, the rule permits no exceptions. It is categorical. The ministerial exception encompasses all adverse personnel or tangible employment actions between religious institutions and their employees and disallows lawsuits for damages based on lost or reduced pay. *See Alcazar v. Corp. of Cath. Archbishop*, 627 F.3d 1288, 1293 (9th Cir. 2010) (en banc). Thus, if OU is a religious organization and Markel is its minister, the exception applies to Markel's claims, which are all employment related. We address each in turn.

## A

Because the ministerial exception only applies to disputes between "religious institutions" and their "ministers," *see Hosanna-Tabor*, 565 U.S. at 705–06, we first consider whether OU is a religious institution. Markel argues that OU is not religious because its kosher food certification program turns a profit and because OU competes with for-profit kosher certification companies in the market. The act of profiting, or competing with for-profit

companies, however, does not inherently make an organization non-religious for purposes of the ministerial exception. Nor does it do so on these facts.

The Supreme Court has never defined what a "religious institution" is. Nor have we in the context of the ministerial exception. But the Court has declined to adopt a "rigid formula" for determining when an employee is a "minister." *Our Lady*, 591 U.S. at 737 (citing *Hosanna-Tabor*, 565 U.S. at 190–91). We likewise decline to adopt such a formula for determining whether an institution is religious. That said, the considerations below, though far from exhaustive, are relevant metrics.

We start with *Our Lady*, the Court's most recent ministerial exception opinion in which the Supreme Court reversed two decisions that originated in the Ninth Circuit.[1] The defendants were Our Lady of Guadalupe School and St. James School, both Catholic primary schools in Los Angeles. *Id.* at 738, 743. The Court implicitly held that both were "religious institutions" by holding the ministerial exception applied. *Id.* at 762. The Court explained that the schools had "religious mission[s] . . . of educating and forming students in the faith." *Id.* Thus, "judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow." *Id.* That these schools charged tuition fees or competed to some extent with other private schools in the market was of no moment. All that mattered was that the schools had a religious mission. We see no reason to deviate from that broad understanding of what

---

[1] In the Supreme Court, *Our Lady* was considered together with *St. James School v. Biel*, No. 19-348, another case that originated in our court. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 679 (2019).

constitutes a religious organization. The acceptance of revenue does not deprive an organization with a religious mission of First Amendment protections.

Other guiding principles can be found in our cases defining "religious organization" in statutes. There too, we have expressly rejected Markel's limited understanding of religious organizations. Consider Title VII. In *Spencer v. World Vision*, we considered whether a not-for-profit, faith-based, humanitarian organization was exempt from Title VII's general prohibition against religious discrimination. 633 F.3d 723, 724 (9th Cir. 2011) (per curiam). Under 42 U.S.C. § 2000e-1(a), Title VII does not apply to a "religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion." This closely mirrors the ministerial exception. The majority explained that an entity is "religious" if (1) "it is organized for a religious purpose," (2) it "is engaged primarily in carrying out that religious purpose," (3) it "holds itself out to the public as an entity for carrying out that religious purpose," and (4) it "does not engage primarily or substantially in the exchange of goods or services for money beyond nominal amounts." *Spencer*, 644 F.3d at 724. Though we do not adopt this test wholesale, it tracks the guidance in *Our Lady* and may be looked to when considering whether defendants are religious organizations.

*Spencer*'s first three prongs all point toward OU being a religious organization. First, it is undisputed that OU was organized to support the Orthodox Jewish community, as shown in its articles of incorporation. Indeed, OU's activities primarily serve this purpose, including by providing religious programming to its community of synagogues to "promo[te] traditional, or Orthodox, Judaism worldwide." For example, OU provides youth and teen

programs, as well as educational services to special-needs students. And OU, of course, holds itself out to the public as religious.

The last prong merits further discussion. Markel claims OU cannot satisfy prong four because OU's kosher certification program generates revenue. But, as we discussed above, the presence of revenue does not make OU non-religious. For that reason, *Spencer*'s fourth prong, while helpful, should not be applied literally when analyzing whether a religious organization is protected under the First Amendment.[2] OU may generate revenue, but it is still a tax-exempt 501(c)(3) organization. So its revenue does not benefit any private interest.[3] Rather, like all 501(c)(3) organizations, any earnings must be used for exempt purposes. OU uses its earnings for religious and educational purposes, including supporting its "youth, teen, and educational programming" as well as its "core mission." Markel's claim that OU cannot be religious because it generates revenue conflicts with our tax code and would elevate one prong in *Spencer* above all the others. Nothing in *Spencer* compels such a result, which is inconsistent with

---

[2] The Supreme Court has held, for example, that persons are not stripped of statutory protections for religious beliefs simply because they organize their businesses as for-profit corporations. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 691 (2014) (The "plain terms of [the Religious Freedom Restoration Act of 1993] make it perfectly clear that Congress did not discriminate in this way against [persons] who wish to run their businesses as for-profit corporations in the manner required by their religious beliefs.").

[3] IRS, *IRS Exemption Requirements – 501(c)(3) Organizations*, https://www.irs.gov/charities-non-profits/charitable-organizations/exemption-requirements-501c3-organizations ("no part of a section 501(c)(3) organization's net earnings may inure to the benefit of any private shareholder or individual.").

what happened in *Our Lady*. The essence of the *Spencer* inquiry points in only one direction—OU is a religious organization.

B

Having decided that OU is a religious organization, we turn to whether Markel was its minister. We first recognize that the "ministerial exception encompasses more than a church's ordained ministers." *Alcazar*, 627 F.3d at 1291 (collecting cases). Indeed, "most faiths do not employ the term 'minister,' and some eschew the concept of formal ordination." *Hosanna-Tabor*, 565 U.S. at 202 (Alito, J., concurring). Perhaps recognizing this, the Supreme Court has declined "to adopt a rigid formula for deciding when an employee qualifies as a minister." *Our Lady*, 591 U.S. at 750 (quoting *Hosanna-Tabor*, 565 U.S. at 190). That said, the Court has provided ample guidance. We first review the Court's recent precedent for how to assess whether Markel is a minister.

We start with *Hosanna-Tabor*. There, Cheryl Perich was a "called teacher" employed by Hosanna-Tabor, a member congregation of the Lutheran Church—Missouri Synod. *Hosanna*-Tabor, 565 U.S. at 177–78. "'Called' teachers are regarded as having been called to their vocation by God through a congregation." *Id.* at 177. She taught elementary students multiple subjects, including "a religion class four days a week." *Id.* at 178. She also "led the students in prayer and devotional exercises each day[] and attended a weekly school-wide chapel service." *Id.* Twice a year, she led this chapel service herself. *Id.* Perich was terminated by Hosanna-Tabor because medical issues precluded her from doing her job. *Id.* at 179. She filed a charge with the Equal

Employment Opportunity Commission, who then filed suit against Hosanna-Tabor. *Id.* at 180. Perich intervened. *Id.*

The Supreme Court held that the ministerial exception barred consideration of Perich's claims. *Id.* at 190. Ministers, the Court explained, are "not limited to the head of a religious congregation." *Id.* Rather, Perich was a minister because she was chosen to "preach [a religious institution's] beliefs, teach their faith, and carry out their mission." *See id.* at 196.

To arrive at this conclusion for Perich, the Court "identified four relevant circumstances but did not highlight any as essential." *Our Lady*, 591 U.S. at 750 (discussing *Hosanna-Tabor*). First, Hosanna-Tabor "held Perich out as a minister, with a role distinct from that of most of its members." *Hosanna-Tabor*, 565 U.S. at 191. Second, "Perich's title as a minister reflected a significant degree of religious training followed by a formal process of commissioning." *Id*. Third, Perich "held herself out as a minister of the Church by accepting the formal call to religious service." *Id*. at 191–92. Finally, Perich's "job duties reflected a role in conveying the Church's message and carrying out its mission." *Id*. at 192. This conclusion held even though "others not formally recognized as ministers by the church perform the same functions." *Id.* at 193. Nor did it matter that "her religious duties consumed only 45 minutes of each workday" while the rest was "devoted to teaching secular subjects." *Id*.

The Court next applied the ministerial exception in *Our Lady*. There, the Court considered whether two Catholic school teachers were mission-critical employees. 591 U.S. at 738. The Court held that they were. *Id.* at 762. In the process, the Court did not mechanically apply *Hosanna-*

*Tabor*'s factors, and thus did not "demand[] . . . a 'carbon copy' of the [same] facts." *Id.* at 745–46 (citing *Biel v. St. James Sch.*, 926 F.3d 1238, 1239 (9th Cir. 2019) (R. Nelson, J., dissenting from denial of rehearing en banc)). The Court explained that such an approach would be "contrary to [the Court's] admonition" not to "impos[e] any 'rigid formula.'" *Id.* at 757–58 (quoting *Hosanna-Tabor*, 565 U.S. at 190).

To make this clear, the Court identified ways that strict application of *Hosanna-Tabor* did not dictate the outcome. For example, the Court acknowledged that both plaintiffs had "less religious training than Perich," but did not regard this as dispositive. *Id.* at 738. The Court also explained that "[s]imply giving an employee the title of 'minister' is not enough to justify the exception," and "by the same token, since many religious traditions do not use the title 'minister,' it cannot be a necessary requirement." *Id.* at 752. Requiring such a title would likely "constitute impermissible discrimination." *Id.*

*Our Lady* thus rejected attempts in the lower courts to turn the *Hosanna-Tabor* guideposts into a one-size-fits-all test. *Id.* But *Our Lady* extols one of its factors above all— the one that concerns the employee's "role" within the religious organization. *See id.* at 757. As the Court explained, "[t]he circumstances that informed [the Court's] decision in *Hosanna-Tabor* were relevant because of their relationship to Perich's 'role in conveying the Church's message and carrying out its mission.'" *Id.* at 751–52 (quoting *Hosanna-Tabor*, 565 U.S. at 192). Put differently, those factors showed Perich's mission-critical role and purpose, but they were not "necessarily important[] in all other cases." *Id.* at 752. "What matters, at bottom, is what an employee does." *Id.* at 753.

*Our Lady* thus clarifies that a faith's minister broadly includes any individual "essential to the institution's central [religious] mission." *Id.* at 746. Since the "very reason for the existence" of Catholic schools was the "religious education and formation of students," the "selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission." *Id.* at 738. Thus, because the school's "religious mission entrusts [its] teacher[s] with [such] responsibility," "judicial intervention into disputes between the school and teacher threatens the school's independence in a way that the First Amendment does not allow." *Id.* at 762.

*Our Lady* thus recognized a broad view of who counts as a minister for purposes of the ministerial exception. Indeed, the Supreme Court reversed our prior narrow view of who counts as a minister. *Id.* at 758, 760–61 (rejecting the Ninth Circuit's prior test as "rigid" and "distorted"); *see also Biel*, 926 F.3d at 1239–40 (R. Nelson, J., dissenting from denial of rehearing en banc) (noting the "narrow construction" adopted in *Biel v. St. James Sch.*, 911 F.3d 603 (9th Cir. 2018), and *Morrissey-Berru v. Our Lady of Guadalupe Sch.*, 769 F. App'x 460 (9th Cir. 2019), should be reversed). If individuals "perform[] vital religious duties," they are "ministers" of that faith for purposes of the ministerial exception. *See Our Lady*, 591 U.S. at 756.

Applying both *Hosanna-Tabor* and *Our Lady*, and considering the Religion Clauses, Markel was OU's minister, and thus the ministerial exception applies. We first recognize, as the Supreme Court did, that "Judaism has many 'ministers'" because "the term 'minister' encompasses an extensive breadth of religious functionaries in Judaism." *Id.* at 752 (internal citation omitted). And we conclude that Markel's role as a *mashgiach* was "essential to [OU's]

[religious] mission." *Id.* at 746. It thus follows that he was OU's minister.

As a head *mashgiach* for two wineries, Markel was responsible for the kosher integrity of its grape products. *Kashruth*, or "keeping kosher," is essential to observing Orthodox Judaism, and OU's central mission is to support Orthodox Jews as they strive to fully live their faith. To fill that role, Markel had to submit a letter from an Orthodox rabbi certifying that he was an observant Jew, including that he kept the Sabbath and followed kosher laws. A core part of the ministerial exception's purpose is to protect a religious institution's autonomy to "select[] . . . the individuals who play certain key roles" that are "essential to the institution's central mission." *Id.* Because only observant Orthodox Jews can serve as *a mashgiach* for the OU, and because they are necessary to carrying out OU's religious mission of "ensuring the wide availability of kosher food," a *mashgiach* is a minister for purposes of the ministerial exception.

In so holding, we join the Fourth Circuit, which held that a *mashgiach* is a Jewish minister. *See Shaliehsabou*, 363 F.3d at 301. There, the plaintiff, Shaliehsabou, worked as a *mashgiach* at Hebrew Home, a Jewish-affiliated elder care home. *Id.* at 308–09. His "basic responsibility [at the Hebrew Home] was to guard against any violations of Jewish dietary law." *Id.* at 303 (citation omitted) (alteration in original). Shaliehsabou "alleged that [] Hebrew Home failed to pay him overtime wages as required by federal and state laws." *Id.* at 304. The Fourth Circuit held that the ministerial exception barred Shaliehsabou's claims. *Id.* at 311.

Shaliehsabou raised the same objections to the ministerial exception as Markel does here. These were that

(1) "his primary duties [were] not ministerial," *id.* at 307–08, and (2) "the Hebrew Home [was] not a religious institution," *id.* at 308.  Markel argues similarly that his job did not involve any religious duties, but was factory or food services work, not religious work.  Shaliehsabou also argued that "apart from being an Orthodox Jew, no special training is required to serve as a *mashgiach*."  *Id.* (emphasis added).  Markel claims the same.

The Fourth Circuit agreed with Hebrew Home.  Comparing Shaliehsabou's role to others deemed to be ministerial, such as music ministers or communications managers, the court did not "see any meaningful distinction."  *Id.* at 308–09.  "Shaliehsabou's duties required him to perform religious ritual," and he "occupied a position that is central to the spiritual and pastoral mission of Judaism."  *Id.* at 309.  Because of this, "failure to apply the ministerial exception [to a *mashgiach*] would denigrate the importance of keeping kosher to Orthodox Judaism."  *Id.*

Shaliehsabou's reasoning—which predated *Hosanna-Tabor* and *Our Lady*—is even more compelling considering the Supreme Court's subsequent decisions.  Our holding today thus squarely follows the Fourth Circuit's lead twenty years ago.  Failing to apply the ministerial exception here would inappropriately denigrate the Jewish faith.  Just like Hebrew Home, OU has represented that Markel served as "the vessel through whom compliance with the *kashruth* was ensured" for those that purchased OU's kosher grape products.  Thus, while Markel identifies ways that this case is dissimilar to *Hosanna-Tabor*, such as that he was not a Rabbi, had no formal title, and did not receive religious training from OU, these distinctions do not control our analysis.  It would be inappropriate to require the same factors be met here as in *Hosanna-Tabor*, given the

differences between Lutheranism and Orthodox Judaism.
*Cf. Our Lady*, 591 U.S. at 752–53. All that matters is that
Markel played a role in "carrying out [OU's religious]
mission," *see id.* at 752, of providing kosher-certified foods
so that Orthodox Jews could observe their faith. There is no
material dispute of fact that he did. He is thus a minister.

C

Finally, we clarify the scope and purpose of the
ministerial exception. Markel argues that it should not apply
here because his dispute with OU is secular. Put differently,
Markel invites us to create a rule that if a religious purpose
did not animate the relevant employment decisions, then the
ministerial exception should not apply, and the case should
be allowed to proceed to discovery. Markel claims
discovery would not create a constitutional issue here
because no "religious decision" was involved.

Markel's argument raises two separate, but related
issues. First, can issues involving a religious institution ever
be bifurcated into being either "religious" or "non-
religious?" And second, does a religious institution need to
identify a "religious" justification for its employment-
related decisions to invoke the ministerial exception? The
answer to both questions is no. Delineating a religious
organization's decisions between religious and secular
would create excessive entanglement between the church
and state, given the coercive nature of the discovery process.
Nor would it be appropriate. A religious institution's
decisions, even if facially secular, are often intertwined with
religious doctrine. By that same token, our cases forbid
religious institutions from requiring a religious justification
for their decisions. We thus reiterate that a religious

organization need not provide any religious justification to invoke the ministerial exception.

1

To address the first question, we look to the Establishment Clause's original public meaning. *See Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 60 (2019) ("look[ing] to history for guidance" to interpret the Establishment Clause); *see also Kennedy v. Bremerton Sch. Dist.*, 4 F.4th 910, 950 (9th Cir. 2021) (R. Nelson, J., dissenting from denial of rehearing en banc) (A "history-based test is not *a* way to approach Establishment Clause cases . . . [but] *the* way." (citation omitted) (emphasis in original)). As explained earlier, its fundamental purpose was to disentangle government and religion, or to prevent excessive entanglement. It was drafted under the backdrop of the established Church of England, over which the King of England and Parliament exercised significant control, not only in matters of personnel, but also in matters of doctrine and worship. *Hosanna-Tabor*, 565 U.S. at 182–83. This type of established religion was present in the colonies too. "[F]or example, in the Colony of Virginia, where the Church of England had been established, ministers were required by law to conform to the doctrine and rites of the Church of England." *Lee v. Weisman*, 505 U.S. 577, 641 (1992) (Scalia, J., dissenting).

"The Framers"—and the American public—thus "understood an establishment necessarily to involve actual legal coercion." *Van Orden v. Perry*, 545 U.S. 677, 693 (2005) (Thomas, J., concurring) (cleaned up); *see District of Columbia v. Heller*, 554 U.S. 570, 576 (2008) ("the Constitution was written to be understood by the voters" at the time it was ratified). And the "coercion that was a

hallmark of historical establishments was coercion of religious orthodoxy." *Lee*, 505 U.S. at 640 (Scalia, J., dissenting); *see Our Lady*, 591 U.S. at 747 ("The constitutional foundation for our holding was the general principle of church autonomy to which we have already referred: independence in matters of faith and doctrine."). "Orthodoxy" is broad and includes a religion's "belief[s] or practice[s]."[4]  The ministerial exception thus must be robust enough to disallow the government, including the judiciary, from ever parsing out or defining for any religion what its beliefs or practices are.

Here, OU represents that it is generally recognized within Orthodox Judaism that a *mashgiach* fills a key role in helping Orthodox Jews practice their religion.  This representation falls within the scope of "orthodoxy," given that it touches on both Jewish beliefs, including about Jewish law, and Jewish practices—"keeping kosher."  Thus, since OU's representation concerns its "orthodoxy," this ends our inquiry into whether OU's practices are central to its religious mission.  Any other approach would permit the government to involve itself in matters of a religion's orthodoxy.  "The First Amendment outlaws such intrusion." *Our Lady*, 591 U.S. at 746.

Consider the Supreme Court's decision in *National Labor Relations Board v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979).  There, the Court considered whether teachers in religious schools who taught both religious and secular subjects are subject to the National Labor Relations Act, and if so, whether this violated the First Amendment. *Id.* at 491.  At the time, the Board distinguished between "completely religious" and "merely religiously associated"

---

[4] *Webster's New International Dictionary* 1594 (3d ed. 2002).

schools, exercising jurisdiction only over the latter. The Court rejected this binary, explaining that "religious doctrine" can always be—and often is—intertwined with "secular" things. *See id.* at 501–03. Put differently, excessive entanglement is unavoidable, because even if an issue seems secular, a minister's "handling of the subject [may] not [be]." *Id.* at 501. And the harm would not just stem from the government *reaching* conclusions about a religion and its ministers. Instead, "the very process of inquiry leading to findings and conclusions" "may [itself] impinge on rights guaranteed by the Religion Clauses."[5] *Id.* at 502.

Later cases raised similar concerns with allowing the government—including the courts—to scrutinize religious decisions. The Supreme Court explained that "[i]t is a

---

[5] This is not, of course, to say that all discovery is impermissible. As the Seventh Circuit recently explained, "The ministerial exception's status as an affirmative defense makes some threshold inquiry necessary . . . [but] discovery to determine who is a minister differs materially from discovery to determine how that minister was treated." *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 983 (7th Cir. 2021) (en banc). Discovery must be limited to whether an employee is ministerial—the First Amendment generally prohibits merits discovery and trial.

We also agree with other courts who have recognized that the ministerial exception can be raised by courts sua sponte if considering a claim would risk entangling the judiciary in religious issues in violation of the Religion Clauses. *See Billard v. Charlotte Cath. High Sch.*, No. 22-1440, slip op. at 15 (4th Cir. 2024) ("because the ministerial exception 'implicate[s] important institutional interests of the court,' we retain discretion to raise and consider it *sua sponte* – even if waived"); *see also Lee v. Sixth Mount Zion Baptist Church*, 903 F.3d 113, 118 n.4 (3d Cir. 2018) ("the exception is rooted in constitutional limits on judicial authority"); *EEOC v. Cath. Univ. of Am.*, 83 F.3d 455, 459–60 (D.C. Cir. 1996) (same).

significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious. . . . [A]nd an organization might understandably be concerned that a judge would not understand its religious tenets and sense of mission." *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 336 (1987).

We decline to impose such a burden on religious organizations or to subject them to a concern that their religious beliefs are being judicially misunderstood or unfairly maligned. To conclude otherwise could mean that "[f]ear of potential liability [would] affect the way an organization carried out what it understood to be its religious mission," *id.*, contrary to the First Amendment's protections. Given the risk that stems from the process of judicial inquiry itself, we reject Markel's argument that the ministerial exception is inapplicable because his dispute involves only "secular" issues. This distinction not only lacks constitutional significance but would lead to unconstitutional judicial action.

2

Having clarified that a religious institution's decisions should not be delineated between "religious" and "secular," we reiterate that the ministerial exception forbids courts from requiring religious institutions to proffer a religious justification before invoking the exception.

We decided this issue in *Bollard v. California Province of the Society of Jesus*, 196 F.3d 940 (9th Cir. 1999). There, the plaintiff, who was training to be a priest, sued his religious employer alleging severe sexual harassment. *Id.* at 944. The defendants did not offer a religious justification

for the harassment the plaintiff experienced. *Id.* at 947. To the contrary, "they condemn[ed] it as inconsistent with their values and beliefs." *Id.* And the defendants wanted plaintiff as a minister of the Catholic faith and "enthusiastically encouraged [his] pursuit of the priesthood." *Id.* But the sexual harassment was so severe that the plaintiff alleged he was constructively discharged. *Id.* at 944.

Even though there was no religious justification offered, we explained that the "ministerial exception lies so close to the heart of the church that it would offend the Free Exercise Clause simply to require the church to articulate a religious justification for its personnel decision." *Id.* We explained that "[t]he free exercise clause of the First Amendment protects the act of a decision rather than a motivation behind it." *Id.* (citation omitted). Thus, *Bollard* recognized that any inquiry or scrutiny into a religious justification (or lack thereof) for a tangible employment action is per se unconstitutional.[6]

---

[6] Even so, *Bollard* did not apply the ministerial exception. It concluded that the damages the employee sought were "limited and retrospective" and therefore did not intrude into the religious organization's religious decisions. *Id.* at 950. *Hosanna-Tabor* has since made clear that the ministerial exception bars damages claims for adverse employment actions that fall under the ministerial exception since "[a]n award of such relief would operate as a penalty on the Church for terminating an unwanted minister." 565 U.S. at 194. *Bollard*'s suggestion that damages are permissible against religious organizations where the ministerial exception is triggered is impossible to reconcile with *Hosanna-Tabor*. To the extent there is any debate about that question, that portion of *Bollard* is overruled. *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003). Judge Sanchez addresses a different issue—whether the ministerial exception bars *all* damages actions against a religious institution by a ministerial employee. Concurrence at 28–29 n.1. That issue is neither raised nor addressed in this case.

The Seventh Circuit in *Demkovich*, 3 F.4th at 973, reached a similar conclusion.  There, the plaintiff, a music director for a Catholic parish, was fired allegedly because he was gay.  *Id.* He sued, and the defendants invoked the ministerial exception.  *Id.* at 973–74.  The district court held that the ministerial exception did not apply because the religious organization did not "proffer[] a religious justification for [its] alleged conduct."  *Id.* at 974.

The Seventh Circuit reversed.  It recognized that "a minister's legal status . . . differs from nonreligious employment, or even from nonministerial employment within a religious organization," because "[r]eligion permeates the ministerial workplace."  *Id.* at 978–79.  So, "[t]he contours of the ministerial relationship are best left to a religious organization, not a court."  *Id.* at 979.  The court thus rejected the idea that a religious organization needed to provide any religious justification for its ministerial relationships, explaining that "[t]o do so would contravene the Religion Clauses" and "lead to impossible intrusion into, and excessive entanglement with, the religious sphere."  *Id.* at 980.  We agree.

Both *Bollard* and *Demkovich* show that religious organizations need not have a specific religious purpose to invoke the ministerial exception.  Such a narrow conception of religiousness would contradict Supreme Court precedent, *cf. Cath. Bishop*, 440 U.S. at 501–03; *see also Hosanna-Tabor*, 565 U.S. at 194 ("The purpose of the ministerial exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason."), and our own.  Having determined that Markel was a ministerial employee, we also conclude that OU was not required to provide a religious reason for its actions.

IV

Finally, we address who the ministerial exception protects. Markel brings claims against both his former employer and his former supervisor. We have not yet considered whether the exception protects a plaintiff employee's supervisor or other religious leaders as well as the plaintiff's religious employer. Given the broad purpose of the ministerial exception, however, we conclude that it protects a religious organization's supervisors and religious leaders from claims brought by ministerial employees.

The Seventh Circuit's decision in *Demkovich* is again helpful in answering this question. There, the plaintiff's allegations "center[ed] on his relationship with his fellow minister and supervisor," and what "one minister[] said to another," 3 F.4th at 977–80, just as Markel's allegations do here. The court recognized that "[h]ow one minister interacts with another, and the employment environment that follows, is a religious, not judicial, prerogative." *Id.* at 980. Thus, "[a]djudicating [the plaintiff's] allegations of minister-on-minister [misconduct] would not only undercut a religious organization's protected relationship with its ministers, but also cause civil intrusion into, and excessive entanglement with, the religious sphere." *Id.* at 977–78.

Nothing about the constitutional analysis changes if the defendant is another minister. Substantively, litigation would still permit a court to "prob[e] the ministerial work environment," which would "interfere[] with the Free Exercise Clause." *Id.* at 980. Procedurally, discovery would still result in "depositions of fellow ministers and the search for a subjective motive behind the alleged hostility," which would create excessive government entanglement, no matter who the defendant was. *See id.* at 983. Once more, "the very

process of inquiry" in considering claims brought by one minister against another regarding tangible employment actions "may impinge on rights guaranteed by the Religion Clauses." *Cath. Bishop*, 440 U.S. at 502.

Since the same constitutional harm looms regardless of whether an employee-plaintiff's employment-related claims are against the religious organization or its leaders, we hold that the ministerial exception protects both.  Given this, we affirm the district court's dismissal of the claims against Rabbi Rabinowitz.[7]

V

OU is a religious organization and Markel is its minister. Markel's claims implicate a tangible employment decision. And the ministerial exception protects both religious organizations and religious leaders.  Accordingly, the ministerial exception bars claims brought by Markel against either OU or its leadership.

**AFFIRMED.**

---

[7] We grant Appellees' motion for judicial notice of an amicus brief filed with the Supreme Court in *Our Lady*, 591 U.S. 732.  *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

SANCHEZ, Circuit Judge, concurring in part and concurring in the judgment:

I agree with my colleagues that the ministerial exception applies under the facts of this case.  As a head mashgiach who ensured the kosher certification of grape products, Yaakov Markel's work was essential to the spiritual mission of his employer, the Union of Orthodox Jewish Congregations of America ("Orthodox Union").  The record makes clear that the Orthodox Union is a not-for-profit religious organization whose purpose is to promote and serve the Orthodox Jewish community, including by fostering a central tenet of Orthodox Jewish faith—the observance of dietary laws.  Because Markel qualifies as a minister, his claims challenging the Orthodox Union's "tangible employment actions" are barred under the ministerial exception.  *See Alcazar v. Corp. of Cath. Archbishop of Seattle*, 598 F.3d 668, 674 (9th Cir. 2010) (*Alcazar I*), adopted in part, 627 F.3d 1288 (9th Cir. 2010) (en banc) (*Alcazar II*); *see also Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 308-09 (4th Cir. 2004).

I do not join Section III.C. or in the majority's conclusion that the Supreme Court has taken a "broad" view of who counts as a minister in *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020).  *Our Lady* counsels a "flexible" approach for determining when a religious organization's employee may qualify as a minister, but the exception itself is neither broad nor narrow.  *See id.* at 752-53.  Indeed, *Our Lady* recognized that "[t]his does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the

institution's central mission."  *Id.*  at 746; *see also Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 196 (2012) ("express[ing] no view on whether the [ministerial] exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers.").

Nor have our own cases read the ministerial exception broadly.  In *Bollard v. California Province of the Soc'y of Jesus*, 196 F.3d 940 (9th Cir. 1999), we held that a Title VII claim of sexual harassment against a Jesuit order was not barred under the ministerial exception because the claim did not involve the Church's "choice of representative" or any other "adverse personnel action."  *Id.* at 947.  Nor was the Church "offer[ing] a religious justification for the harassment Bollard alleges," and there was thus "no danger that, by allowing this suit to proceed, we will thrust the secular courts into the unconstitutionally untenable position of passing judgment on questions of religious faith or doctrine."  *Id.*[1]

---

[1] The majority's assertion that *Bollard* was overruled in part by *Hosanna-Tabor* is wrong in its characterization of both *Bollard* and *Hosanna-Tabor*.  See Maj. Op. at 23, n.6.  As the majority acknowledges in the same footnote, *Bollard* did not apply the ministerial exception because "the issue in [that] case [was] whether Bollard was subjected to sex-based harassment by his superiors that was sufficiently severe or pervasive as to be actionable under Title VII."  196 F.3d at 949.  *Bollard* does not suggest, as the majority contends, that damages are permissible where the ministerial exception is triggered because the ministerial exception was never triggered.  *See id.* at 947.  Nor did *Hosanna-Tabor* overrule *Bollard* in any way.  *Hosanna-Tabor* expressly did not address whether the ministerial exception applies in suits involving tortious conduct by a religious employer, 565 U.S. at 196, and indeed, the Court cited *Bollard* with approval in concluding that the ministerial exception

In *Elvig v. Calvin Presbyterian Church,* 375 F.3d 951 (9th Cir. 2004), we similarly did not adopt a broad or narrow view of the ministerial exception. The plaintiff, an ordained minister, alleged she was sexually harassed by the Church's pastor and fired for reporting it. *Id.* at 953-54. To the extent her claims involved an inquiry into the Church's decision to terminate her employment, that inquiry was foreclosed because it involved "the Church's decision-making about who shall be a minister of the Church—a decision clearly within the scope of the ministerial exception." *Id.* at 958 (citing *Bollard*, 375 F.3d at 947). But the plaintiff's narrower sexual harassment and retaliation claims were allowed to proceed because they did not implicate a protected employment decision, and as in *Bollard*, the Church did not offer a religious justification for the alleged sexual harassment. *Id.* at 959, 962.

The ministerial exception thus requires a nuanced analysis "that respects both the individual rights Congress enacted and a church's constitutional right to be free of doctrinal interference." *Id.* at 969. Under the exception, "courts are bound to stay out of *employment* disputes involving those holding certain important positions with churches and other religious institutions," such as in "the selection of the individuals who play certain key roles" within the institution. *Our Lady*, 591 U.S. at 746 (emphasis added). As the majority notes, if individuals "perform[] vital religious duties" that lie "at the core of the mission" of the

---

operates as an affirmative defense to an otherwise cognizable claim. *See id.* at 195 n.4. *Hosanna-Tabor* does not address—much less undermine—*Bollard*'s conclusion that a retrospective damages suit for sexual harassment against a religious employer was not barred by the First Amendment. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (explaining "clearly irreconcilable" standard).

religious institution, they are "ministers" for purposes of the ministerial exception.  *Id.* at 756.

This case does not require us to adopt either a broad or narrow view of the ministerial exception, or to wade into questions about whether a court can differentiate between "secular" or "religious" decisions.[2]   To the extent the majority suggests that the ministerial exception also bars non-employment-related claims brought by a ministerial employee, that view is at odds with both Supreme Court and circuit precedent.

---

[2] Such analysis is unnecessary because once an employee is determined to be a minister, it does not matter whether the religious institution invokes a religious justification for its employment decision.  *See Hosanna-Tabor*, 565 U.S. at 194-95 ("The purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason.  The exception instead ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—is the church's alone.") (cleaned up).