Filed 3/2/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MICHAEL EHRENKRANZ,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>SAN FRANCISCO ZEN CENTER et al.,<br><br>     Defendants and Respondents. | A171527<br><br>(City & County of San Francisco<br>Super. Ct. No. CGC-22-602048) |

Plaintiff Michael Ehrenkranz filed claims with the Labor Commissioner against San Francisco Zen Center (Center), Linda Galijan, and Mike Smith (when referred to collectively, defendants) for wage-and-hour violations. The Labor Commissioner ruled in favor of Ehrenkranz, and defendants appealed the decision, resulting in a de novo action in the trial court.

Ehrenkranz moved to dismiss the appeals of Galijan and Smith on the ground they failed to post an undertaking as required by Labor Code section 98.2, subdivision (b).[1] The trial court denied that motion. Defendants then moved for summary judgment, arguing that Ehrenkranz's claims were barred by the ministerial exception of the First Amendment, an affirmative defense. The court granted that motion and entered judgment for defendants.

---

[1] Further undesignated statutory references are to the Labor Code.

1

Ehrenkranz appeals that judgment, asserting two main arguments , that the trial court erred (1) in granting summary judgment because there is no evidence that his wage claims raised an ecclesiastical concern and thus that his claims violated the Religion Clauses of the First Amendment, and (2) in denying his motion to dismiss the appeals of Galijan and Smith because its finding that they satisfied the undertaking requirement in section 98.2 was based on a misinterpretation of the statute.

Months ago, our colleagues in Division Five filed an opinion involving facts strikingly similar to those present here, in an appeal arising in the same setting as here, which raised the identical issues presented here, and involved the same arguments Ehrenkranz makes here. That case is *Lorenzo v. San Francisco Zen Center et al.* (Nov. 21, 2025, A171659) 116 Cal.App.5th 258, review granted February 11, 2026, S294565 (*Lorenzo*), and in it Division Five ruled for Lorenzo all the way. Thereafter, our Supreme Court granted review of the ministerial exception issue.[2] Pending guidance from the Supreme Court, we agree with the reasoning of *Lorenzo* as to the Religion Clauses analysis and adopt the same conclusions here, and thus hold that the trial court erred in finding that the ministerial exception barred Ehrenkranz's wage-and-hour claims because defendants presented no evidence that his claims raised an ecclesiastical concern. We therefore reverse the summary judgment.

But we part company with our colleagues on the second issue and

---

[2] The question currently pending review is: "Does the ministerial exception arising under the Religion Clauses of the First Amendment to the United States Constitution categorically preclude wage and hour claims by a minister against a religious organization without any inquiry into whether the claim touches upon any ecclesiastical concern?" (*Lorenzo*, review granted Feb. 11, 2026, S294565.)

2

conclude that the trial court did not err in denying Ehrenkranz's motion to dismiss the appeals of Galijan and Smith.

## BACKGROUND

### The Facts

#### *The Center*

The Center is a nonprofit religious corporation founded in 1962 and is one of the largest Sōtō Zen Buddhist churches in North America. Its "specific and primary purpose" is to "encourage the practice of Zen Buddhism by operating one or more religious practice facilities and educating the public about Zen Buddhism." The Center consists of three temples: City Center, Tassajara Mountain Center (Tassajara), and Green Gulch Farm. The Center has residential training programs at all three of its temples. Smith is the former City Center director. Galijan is the former president of the Center.

The Center generates income by renting out rooms at all three temples to overnight guests who are not members, as well as conference and event space at Green Gulch Farm to companies including Google and Facebook. Tassajara is open to the public and guests staying there go to "the hot springs" or "baths" and do not have to practice Buddhism. Between 2015 and 2019, the Center's "primary source of income" came from the summer guest season at Tassajara.

The Center offers three residential programs, each of which requires having participated in the preceding program. First, an individual can be a "guest student" who lives at the temple for two to six weeks. After at least a two-week stay, a guest student may apply to the "Work Practice Apprentice" (WPA) program, an entry-level, full-time "Zen training program that lasts 2 years and must be completed within 3" years. "WPAs follow a strict practice schedule of formal and work practice." Formal practice includes morning and

3

evening zazen (meditation), service (sutra chanting and bowing), soji (temple cleaning), dharma talks, and special ceremonies. Work practice is "[a]n integral part of Zen Buddhist practice." It consists of tasks such as cooking, dishwashing, cleaning, as well as ceremonial tasks that "support the formal practice, such as ringing bells, cleaning altars, [and] watching the door during zazen [meditations]." "WPAs are expected to take part [in] 30–35 hours of work practice, as well as talks, discussions, and classes on work practice, and 20 hours per week of meditation and curriculum."

After completing training as a WPA, an individual may apply for a staff position at the Center, "which is a continuation of Zen training." Staff members must "live at the practice center where they work in order to accomplish both their practice obligations and their specific work practice responsibilities." The Center provides WPAs and low-level staff with modest monthly stipends as well as room and board.

### *Ehrenkranz's Time at the Center*

In June 2016, after participating as a guest student of the Center, Ehrenkranz became a WPA. From June to September 2016, he worked in the guest program crew, where he was assigned guest housekeeping and maintenance work tasks by a senior staff member. Ehrenkranz worked mainly in the guest house, which was reserved for paying overnight guests. His tasks included cleaning and preparing guest rooms and guest bathrooms, cleaning the common spaces of the guest houses, chopping firewood for the fireplaces, building fires for the guests, mowing the lawn, preparing conference spaces for guests, and preparing drinks and snacks.

Ehrenkranz took a leave of absence from the end of December 2016 through the end of January 2017. When he returned to the Center, he was assigned to the kitchen crew. His responsibilities included chopping

4

vegetables and preparing meals for other residents of the center as well as paying overnight and conference guests.  Between April and September 2017, Ehrenkranz was asked to perform childcare for some of the Center's senior staff in addition to working in the kitchen crew.

On September 26, 2017, Ehrenkranz moved to the Tassajara location. During one winter practice period there, he worked in the garden crew, which required him to maintain the grounds.  During another winter practice period, he worked again in the kitchen crew, helping prepare meals for other residents.

In April 2018, Ehrenkranz became a Tassajara guest cook for the summer guest season, and his stipend increased from $175 to $245 per month.  As a guest cook, he was responsible for creating menus, preparing orders of the ingredients necessary for meals, writing instructions for the general kitchen crew, preparing guest meals, and coordinating menu and service details with the dining room waitstaff crew.

In July 2018, Ehrenkranz became a staff member.  When the Tassajara summer guest season ended on September 25, 2018, he was assigned to be a teacher's assistant.  Ehrenkranz asked the Center not to give him the teacher's assistant position because he wanted to remain in the kitchen crew, but the Center denied his request.  His stipend decreased to $200 per month.

In November 2018, Ehrenkranz left the Center.

**Proceedings Before the Labor Commissioner and Appeal**

In August 2020, Ehrenkranz filed a claim with the Labor Commissioner for wage-and-hour violations.[3]  His complaint alleged that he

_____

[3]     "The Labor Code provides an administrative procedure for recovery of unpaid wages.  When an employer does not pay wages as required, the employee may either: (1) file a civil action in court, or (2) file a wage claim

5

was owed regular and overtime wages, split-shift premium wages, liquidated damages for the work he performed at the Center, unreimbursed business expenses, and waiting time penalties.

Following a hearing, the Labor Commissioner issued an "Order, Decision, or Award" on September 2, 2023, and on September 16 an amended order, in Ehrenkranz's favor against all three defendants (Order or Labor Commissioner Order). As to Galijan and Smith, the Commissioner found that they were individually liable under section 558.1 because they "were in charge of all three facilities at some point and made decisions as to how the facilities were r[u]n." The total amount awarded against defendants was $81,170.23, which consisted of unpaid minimum wages, unpaid overtime wages, split shift premiums, liquidated damages, interest, and waiting time penalties. The Labor Commissioner found that the Center was "liable for the full amount" and that Galijan and Smith were liable for $78,857.58 of the full amount.

On September 22, defendants appealed the Order, resulting in a de novo action in the trial court pursuant to section 98.2.[4] The notice of appeal attached a copy of a "Undertaking of Corporate Surety" stating, "Whereas,

---

with the Labor Commissioner under sections 98 to 98.8. The administrative option was added in 1976 . . . and is commonly known as a Berman hearing," named after the sponsor of the legislation. (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 121 & fn. 6.)

[4] "This de novo appeal ' " 'is neither a conventional appeal nor review of the Labor Commissioner's decision, but is rather a de novo trial of the wage dispute' " [citation], and the [trial] court " ' "hears the matter, not as an appellate court, but as a court of original jurisdiction, with full power to hear and determine it as if it had never been before the labor commissioner" ' " [citation].' [Citation.]" (*Lorenzo, supra*, 116 Cal.App.5th at p. 268, fn. 2, quoting *Martinez v. Combs* (2010) 49 Cal.4th 35, 65–66 (*Martinez*), italics omitted.)

San Francisco Zen Center, as Principal, desire to give an undertaking for an appeal as provided by Labor Code Section 98.2," and then indicating that such undertaking in the amount of $81,170.23 was posted through a licensed surety. Thus, under its terms, the undertaking did not include Galijan or Smith.

On January 5, 2024, Ehrenkranz filed an amended motion to dismiss the appeals of Smith and Galijan on the ground they failed to post the undertaking mandated by section 98.2. The trial court denied the motion, finding that Ehrenkranz's "putative employer posted the required undertaking," adding, "The fact that Smith and Galijan are individuals that allegedly acted on behalf of the employer and can also be liable as the employer does not mean that they too needed to file duplicative undertakings."

**Defendants' Motion for Summary Judgment**

On April 12, defendants filed a motion for summary judgment or, alternatively, summary adjudication, "on the ground that the action has no merit because the ministerial exception of the First Amendment of the U.S. Constitution applies to and bars all of [Ehrenkranz's] claims." Defendants relied largely on *Alcazar v. Corp. of Catholic Archbishop of Seattle* (9th Cir. 2010) 598 F.3d 668 (*Alcazar I*), affirmed in part and vacated in part in *Alcazar v. Corp. of the Catholic Archbishop of Seattle* (9th Cir. 2010) 627 F.3d 1288 (*Alcazar II*), a case in which the Ninth Circuit held that the ministerial exception barred a minister's minimum wage claims against his employer, a church.

Ehrenkranz opposed the motion. He argued that the ministerial exception did not apply to his claims because under two United States Supreme Court cases—*Hosanna-Tabor Evangelical Lutheran Church and*

*School v. E.E.O.C.* (2012) 565 U.S. 171 (*Hosanna-Tabor*) and *Our Lady of Guadalupe School v. Morrissey-Berru* (2020) 591 U.S. 732 (*Our Lady*)—the exception exempts religious organizations only from "antidiscrimination laws in the context of hiring and firing their ministers," which he did not allege here. Ehrenkranz also relied on *Tony and Susan Alamo Foundation v. Secretary of Labor* (1985) 471 U.S. 290 (*Alamo*), in which the United States Supreme Court held that the First Amendment's Religion Clauses did not exempt a religious organization engaged in commercial activities from wage-and-hour laws.

On August 6, the trial court issued a written order granting the motion, concluding that the ministerial exception applied to Ehrenkranz's wage-and-hour claims. And although the court acknowledged that "both *Hosanna-Tabor* and [*Our Lady*] implicated wrongful termination claims against religious employers," it believed that "applying wage-and-hour laws to WPAs would create the same judicial entanglement in religious issues the Supreme Court sought to avoid."

On September 24, the court entered judgment in favor of defendants. Ehrenkranz appealed.

## DISCUSSION

Ehrenkranz argues that the trial court erred in granting summary judgment to defendants on the basis of the ministerial exception. Specifically, he contends that neither that exception nor the church autonomy doctrine (also known as the ecclesiastical doctrine)—defenses grounded in the First Amendment—apply to his wage claims. Ehrenkranz further argues the trial court erred in denying his motion to dismiss the purported appeals of Galijan and Smith because they did not post the undertaking required by section 98.2.

8

While this appeal was pending, *Lorenzo*, *supra*, 116 Cal.App.5th 258, a companion case assigned to Division Five of our First District, was decided. Although the two cases are otherwise separate, the plaintiffs are both former WPAs and staff members of the Center; they both asserted wage-and-hour claims; the defendants are the same in both cases; the parties are represented by the same attorneys; and the briefs in both appeals are almost identical. *Lorenzo* resolved all of the issues in favor of the employee in that case. As now explained, we agree with the analysis of *Lorenzo* on the issue of the Religion Clauses. However, we part ways with our colleagues on the issue whether the individual defendants were required to post the undertaking under section 98.2.

## The Trial Court Erred in Granting Summary Judgment
### *Summary Judgment Law and Standard of Review*

Code of Civil Procedure section 437c, subdivision (c) provides that summary judgment is properly granted when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. A moving defendant can meet its burden by demonstrating that "a cause of action has no merit," which it can do by showing either: (1) one or more elements of the plaintiff's cause of action cannot be established; or (2) there is a complete affirmative defense to that cause of action. (Code Civ. Proc., § 437c, subds. (o)(1), (2), (p)(2).) Once the defendant meets this burden, the burden shifts to the plaintiff to show the existence of a triable issue of material fact. (*Id.*, subd. (p)(2).)

"The burden on a defendant moving for summary judgment based upon the assertion of an affirmative defense is heavier than the burden to show one or more elements of the plaintiff's cause of action cannot be established. Instead of merely submitting evidence to negate a single element of the plaintiff's cause of action, . . . 'the defendant has the initial burden to show

9

that undisputed facts support each element of the affirmative defense' [citations]. The defendant must demonstrate that under no hypothesis is there a material factual issue requiring trial. [Citation.] If the defendant does not meet this burden, the motion must be denied." (*Anderson v. Metalclad Insulation Corp.* (1999) 72 Cal.App.4th 284, 289–290.)

"On appeal '[w]e review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. [Citations.]' (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) Put another way, we exercise our independent judgment, and decide whether undisputed facts have been established that negate plaintiff's claims. (*Romano v. Rockwell Internat., Inc.* [(1996)] 14 Cal.4th [479,] 487.) . . . [¶]

" '[W]e accept as true the facts . . . in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them.' [Citation.] And we must ' "view the evidence in the light most favorable to plaintiff[] as the losing part[y]" . . . . ' " (*Nazir v. United Airlines Inc.* (2009) 178 Cal.App.4th 243, 253–254.)

### *The Ministerial Exception*

#### **Legal Background**

"The First Amendment provides, in part, that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.' . . . Both Religion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers." (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 181.) This rule acquired the label "ministerial exception." (*Our Lady*, *supra*, 591 at p. 746; *Lorenzo*, *supra*, 116 Cal.App.5th at p. 269.)

The United States Supreme Court first recognized the ministerial exception in *Hosanna-Tabor*, *supra*, 565 U.S. at p. 171. At issue there was a

church school's termination of a teacher who sued the church for disability discrimination. (*Id.* at p. 178.) The high court characterized the exception as grounded in the Religion Clauses of the First Amendment (*id.* at p. 188) and explained: "The members of a religious group put their faith in the hands of their ministers. Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions." (*Id.* at pp. 188–189.)

The Supreme Court then held that the ministerial exception barred the teacher's discrimination claims. (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 190.) It analyzed whether she was a "minister" covered by the exception, concluding she was. (*Ibid.*) The court also addressed, and rejected, the teacher's suggestion that the asserted religious reason for firing her was pretextual. (*Id.* at p. 194.) "That suggestion misses the point of the ministerial exception. The purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical,' [citation]—is the church's alone." (*Id.* at pp. 194–195.)

Importantly, *Hosanna-Tabor* limited its holding to "an employment discrimination suit brought on behalf of a minister, challenging her church's

11

decision to fire her." (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 196.) In doing so, it "express[ed] no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers." (*Ibid.*)

Nearly a decade later, in *Our Lady*, *supra*, 591 U.S. 732, the United States Supreme Court considered whether the ministerial exception applied to two Catholic elementary school teachers, both of whom lacked the title of minister and had only limited religious training. The high court found the teachers qualified as ministers because there was "abundant record evidence that they both performed vital religious duties." (*Id.* at p. 756.) Thus, the court held that the teachers' employment discrimination claims against their religious school employers were barred by the ministerial exception. (*Id.* at pp. 738, 742, 745.)

The court reiterated the "constitutional foundation" of its prior holding in *Hosanna-Tabor*, which was "the general principle of church autonomy[:] . . . independence in matters of faith and doctrine and in closely linked matters of internal government." (*Our Lady*, *supra*, 591 U.S. at p. 747.) "This does not mean that religious institutions enjoy a general immunity from secular laws," the court explained. (*Id.* at p. 746.) "[B]ut it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission." (*Ibid.*) And one "component of this autonomy is the selection of the individuals who play certain key roles." (*Ibid.*)

### Analysis

Ehrenkranz contends that the trial court erred in applying the ministerial exception to bar his wage-and-hour claims because the United States Supreme Court has only applied the exception to bar a minister's employment discrimination and wrongful termination claims and his wage

12

claims do "not implicate [the Center's] ability to hire or fire its ministers." He claims his case is instead about unpaid minimum wages and does not concern any ecclesiastical matter.

As an initial matter, Ehrenkranz concedes that the Center is a religious organization and that he was a minister for purposes of the ministerial exception.[5] "The only question then, is whether the exception bars [his] wage-and-hour claims despite the lack of any evidence that [his] claims raise an ecclesiastical concern." (*Lorenzo*, *supra*, 116 Cal.App.5th at p. 272.) Based on the reasoning of *Lorenzo* and its comprehensive analysis of the law, we conclude it does not—and we reverse the summary judgment.

In *Lorenzo*, the plaintiff, Annette Lorenzo, lived and worked at the Center between 2015 and 2019, first as a guest student, then a WPA, and eventually a staff member. As a WPA, Lorenzo cleaned guest rooms at the City Center location, and later worked in the bathhouse and kitchen at Tassajara. Like Ehrenkranz, she was a member of the kitchen crew at one point. She then became a staff member, during which time she served as assistant to the executive chef at Tassajara and a librarian. Eventually Lorenzo was asked to leave the Center. (*Lorenzo*, *supra*, 116 Cal.App.5th at p. 267.)

Lorenzo filed claims with the Labor Commissioner against the Center, Galijan, and Smith for wage-and-hour violations and prevailed. (*Lorenzo*,

---

[5]     For this reason, the Center's reliance on *Behrend v. San Francisco Zen Center, Inc.* (9th Cir. 2024) 108 F.4th 765 is unavailing. In that case, the plaintiff was a WPA and filed a claim for disability discrimination after the Center terminated his employment. As a result, the only issue before the Ninth Circuit was whether he qualified as a minister for purposes of the ministerial exception. (*Id.* at pp. 767–768.) *Behrend* also did not involve any wage-and-hour claims. (See *Lorenzo*, *supra*, 116 Cal.App.5th at p. 272, fn. 3.)

*supra*, 116 Cal.App.5th at p. 267.) Defendants appealed to the trial court and moved for summary judgment on the basis of the ministerial exception. The trial court granted the motion. (*Id.* at p. 268.) On appeal from the ensuing judgment, Lorenzo challenged the grant of summary judgment on the same grounds asserted by Ehrenkranz here. (See *id* at p. 272.) Division Five reversed, holding that the ministerial exception does not bar claims under California's minimum wage and overtime laws in the absence of "evidence that those claims would interfere 'with an internal church decision that affects the faith and the mission of the church itself.' " (*Id.* at pp. 265, 275.) In reaching that conclusion, *Lorenzo* provided the following analysis.

"From *Hosanna-Tabor* and *Our Lady*, the only two high court decisions that have addressed the ministerial exception, we can glean the following principles that will guide us here. Not every employment claim raised by a minister is barred by the exception. (See *Our Lady*, *supra*, 591 U.S. at p. 747 [ministerial exception bars only 'certain employment discrimination claims'].) Instead, 'the scope of the ministerial exception . . . is limited to what is necessary to comply with the First Amendment.' (*Bollard v. California Province of the Society of Jesus* (9th Cir. 1999) 196 F.3d 940, 947 (*Bollard*).) And barring a minister's employment claim without any evidence that the claim would raise an ecclesiastical concern is necessary to comply with the First Amendment only if that claim will inevitably 'thrust the secular courts into the constitutionally untenable position of passing judgment on questions of religious faith or doctrine.' (*Bollard,* at p. 947.) Thus, the ministerial exception only bars employment claims that *require* inquiries into matters that are ' " *strictly* a matter of ecclesiastical government' " (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 186, italics added), such as 'the authority to select, supervise, and . . . remove a minister' (*Our Lady*, at p. 747). It does not bar

14

employment claims that 'will have no significant impact on' a church's 'religious beliefs or doctrines.' (*Bollard*, at p. 947.)" (*Lorenzo*, *supra*, 116 Cal.App.5th at pp. 271–272.)

*Lorenzo* found instructive *Alamo*, *supra*, 471 U.S. 290, a case cited by Lorenzo there—and Ehrenkranz here. (See *Lorenzo*, *supra*, 5 Cal.App.5th at pp. 272–273.) In *Alamo*, the high court considered whether applying minimum wage and recordkeeping laws to workers engaged in a religious entity's commercial activities violated the entity's right "to be free of excessive government entanglement in its affairs." (*Alamo*, at p. 303.) The court held that it did not, concluding that the entity's commercial activities "are not beyond the reach of the Fair Labor Standards Act." (*Id.* at p. 306.) In reaching this conclusion, the court observed, "It is virtually self-evident that the Free Exercise Clause does not require an exemption from a governmental program unless, at a minimum, inclusion in the program actually burdens the claimant's freedom to exercise religious rights." (*Id.* at p. 303.) The court concluded that the minimum wage and recordkeeping requirements "have no impact on [the entity's] own evangelical activities" and would not "pose an intolerable risk of government entanglement with religion." (*Id.* at p. 305.)

*Lorenzo* then explained:

"Neither *Hosanna-Tabor* nor *Our Lady* overruled *Alamo*. Nonetheless, the Center contends that *Alamo* did not add any burden requirement to the ministerial exception. The Center is correct because the ministerial exception was not at issue in *Alamo*. But the high court in *Alamo* did consider whether the enforcement of minimum wage laws against a religious entity engaged in commercial activities would result in excessive government entanglement with religion under the church autonomy doctrine and

15

concluded that it would not.  (*Alamo*, *supra*, 471 U.S. at pp. 304–305.)

"Like the plaintiffs in *Alamo*, Lorenzo only challenges the Center's failure to pay her a minimum wage and overtime wages for work that she has already performed as part of the Center's commercial activities.  She does not challenge the Center's decision to terminate her employment or seek reinstatement.  Despite this, the Center asserts that the enforcement of California's wage-and-hour laws would inevitably result in excessive entanglement with religion in violation of the Religion Clauses solely because Lorenzo is a minister.  But the Center does not explain why, and its omission is telling.

"As Justice Edmon explained in her concurring opinion in *Su v. Stephen S. Wise Temple* (2019) 32 Cal.App.5th 1159, 1175 (*Su*), the ministerial exception does not bar an employment claim 'simply because the person on whose behalf a suit is brought is a minister . . . .' [Citation.]  This is because 'the aspect of the church-minister employment relationship that warrants heightened constitutional protection—a church's freedom to choose its representatives'—is not 'present' in every employment claim.  (*Ibid*.)  For example, not every aspect of a minister's compensation is 'an internal church decision that affects the faith and mission of the church itself.'  (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 190.)  Indeed, '[t]he constitutional rationale for protecting some of a church's [autonomy to choose its representatives] . . . [Citation]. . . . does not apply . . . where what is at issue is not who the [church] will select to educate its youngest students, but only whether it will provide the people it has chosen with meal breaks, rest breaks, and overtime pay.'  (*Su*, at p. 1175.)  Thus, the ministerial exception—which only protects decisions that are ' "*strictly* a matter of ecclesiastical government" ' (*Hosanna-Tabor*, at p. 186, italics added)—cannot

16

bar every claim over a minister's compensation.

"A contrary conclusion would be problematic to say the least. For example, religious leaders who have fraudulently compensated themselves at their church's expense should not get a free pass through the ministerial exception. As Judge Bress observed in his concurring opinion in *Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints* (9th Cir. 2025) 127 F.4th 784, 798, footnote 2 (*Huntsman*), 'the church autonomy doctrine would not immunize religious leaders from fraudulently enriching themselves under the guise of religion.' Likewise, a minister's claim for unpaid wages pursuant to an employment contract should not be barred without any evidence of a 'religious justification for' the breach (*Bollard, supra*, 196 F.3d at p. 947) because her religious employer already approved those wages when it agreed to the contract (see *Second Episcopal Dist. African Methodist Episcopal Church v. Prioleau* (D.C. 2012) 49 A.3d 812, 817 . . . . [¶] . . . [¶]

"Thus, the ministerial exception does not bar every employment claim for lost or unpaid wages. Instead, it only bars those claims that necessarily require an inquiry into matters of a religious entity's 'internal government' that are 'closely linked' to the entity's 'faith and doctrine.' [Citation.] The Center does not argue that, much less explain how, Lorenzo's wage-and-hour claims—which only seek lost or unpaid wages for her work in the Church's *commercial* activities—require such an inquiry. [Citation.] Instead, the Center concedes in its opening brief that Lorenzo 'is correct that "[a]djudication of this case does not require the Court to resolve any ecclesiastical questions." ' We therefore conclude that the exception does not bar Lorenzo's claims." (*Lorenzo, supra*, 116 Cal.App.5th at pp. 273–275.)

Likewise here.

17

Like Lorenzo's, Ehrenkranz's wage-and-hour claims seek only lost or unpaid wages for his work as part of the Center's commercial activities. Also, as it did in *Lorenzo*, the Center here concedes "that '[a]djudication of this case does not require the Court to resolve any ecclesiastical questions.' " We therefore conclude that the ministerial exception does not apply to Ehrenkranz's claims in the absence of evidence of an ecclesiastical concern.

We are not convinced otherwise by *Markel v. Union of Orthodox Jewish Congregations of America* (9th Cir. 2024) 124 F.4th 796 (*Markel*)—which defendants assert is "dispositive to Ehrenkranz's claims"—or other Ninth Circuit cases that have held the ministerial exception applies to wage claims. The cases are, of course, not binding (see *Lorenzo*, *supra*, 116 Cal.App.5th at p. 276), as we ourselves have noted in *People v. Mackey* (2015) 233 Cal.App.4th 32, 87: " 'we disagree with the Ninth Circuit's test and are not bound to follow it, even on constitutional questions.' " Beyond that, we agree with *Lorenzo* that the cases "provided little or no analysis to support [their] overly broad interpretation of the ministerial exception." (*Lorenzo*, at p. 276.)

In *Markel*, the Ninth Circuit held that the ministerial exception "encompasses *all* adverse personnel or tangible employment actions between religious institutions and their employees and disallows lawsuits for damages based on lost or reduced pay." (*Markel*, *supra*, 124 F.4th at p. 803, italics added.) However, in support, the Ninth Circuit proffered no explanation for its broad interpretation of the exception. Instead, it simply cited to its prior en banc decision in *Alcazar II*, *supra*, 627 F.3d 1288. (*Markel*, at p. 803; see *Lorenzo*, *supra*, 116 Cal.App.5th at p. 276.)

And in *Alcazar II*, the Ninth Circuit merely adopted, "in all . . . respects," the portion of the three-judge panel's decision "holding that the [ministerial] exception applies to the minimum-wage claim at issue."

(*Alcazar II, supra,* 627 F.3d at p. 1290.) But the panel's decision, in turn, relied primarily on a quote from *McClure v. Salvation Army* (5th Cir. 1972) 460 F.2d 553 (*McClure*) to justify its application of the exception to bar the plaintiff's minimum wage claim: "Just as the initial function of selecting a minister is a matter of church administration and government, so are *the functions which accompany such a selection*[, *including*] *the determination of a minister's salary.*" (*Alcazar I, supra,* 598 F.3d at p. 674, quoting *McClure*, at p. 559.) As *Lorenzo* explained, that reliance on *McClure* was misplaced.

"*McClure*, like *Hosanna-Tabor* and *Our-Lady*, involved only claims for employment discrimination and wrongful termination." (*Lorenzo, supra,* 116 Cal.App.5th at p. 276.) The plaintiff in *McClure*, a minister employed by the Salvation Army, filed a Title VII action against the organization, alleging that "[she] had received less salary and fewer benefits than that accorded similarly situated male officers" and was "discharged because of her complaints to her superiors and the Equal Employment Opportunity Commission." (*McClure, supra,* 460 F.2d at p. 555.) "She sought reinstatement, an injunction against further discriminatory practices, and a judgment for the alleged deficiency in compensation paid to her as compared to male Salvation Army officers whose responsibilities were equivalent to those she performed." (*Ibid.*) In barring the plaintiff's claims under the Religion Clauses, the Fifth Circuit first reasoned that the Salvation Army's selection of its ministers "is a matter of church administration and government" and is "of prime ecclesiastical concern." (*Id.* at p. 559.) It then extended that reasoning to "*functions which accompany such a selection,*" including "*the determination of a minister's salary*" (*ibid.*, italics added.)—the statement quoted in *Alcazar I.* (*Alcazar I, supra,* 598 F.3d at p. 674.)

As explained in *Lorenzo, McClure* does not establish that claims for

19

minimum and overtime wages are barred by the ministerial exception. (*Lorenzo, supra,* 116 Cal.App.5th at p. 277.) For one, *McClure* did not involve any wage-and-hour claims. Further, the resolution of McClure's claim for lost or unpaid wages "would require a review of the Salvation Army's differential treatment of its male and female ministers, including any differing duties and responsibilities. This would, in turn, require a review of 'internal management decisions that are essential to the [religious] institution's central mission.' " (*Lorenzo,* at p. 277.) "The same is not true of [Ehrenkranz's] minimum wage claims." (*Id.* at p. 277 & fn. 4.)

Likewise misplaced is *Alcazar I*'s reliance on *Elvig v. Calvin Presbyterian Church* (9th Cir. 2004) 375 F.3d 951 (*Elvig*). (See *Alcazar I, supra,* 598 F.3d at p. 674.) In *Elvig,* the Ninth Circuit held the ministerial exception barred the plaintiff's claims for sexual harassment and retaliation against her church employer after it fired her, reasoning that because "the termination of [the plaintiff's] ministry and her inability to find other pastoral employment are consequences of protected employment decisions. . . . , a damage award based on lost or reduced pay [she] may have suffered from those employment decisions would necessarily trench on the Church's protected ministerial decisions." (*Elvig,* at pp. 965–966.) Here, in contrast, "[Ehkrenkranz's] wage-and-hour claims are not tied to [any] decision to terminate [his] employment" (indeed, he was not terminated by the Center), and "do not invade the Center's autonomy in the selection of its ministers." (*Lorenzo, supra,* 116 Cal.App.5th at p. 278.)

For these reasons, we decline to follow *Markel*'s broad holding that the ministerial exception bars "*all* adverse personnel or tangible employment actions between religious institutions and their employees." (*Markel, supra,* 124 F.4th at p. 803, italics added.)

20

In sum and in short, the trial court erred in granting summary judgment to defendants.[6]  However, "our ruling here today does not foreclose the Center from presenting evidence at trial that applying wage-and-hour laws to ministers like [Ehrenkranz] raises an ecclesiastical concern and should therefore be barred under the Religion Clauses." (*Lorenzo*, *supra*, 116 Cal.App.5th at p. 280.)

**The Trial Court Did Not Err in Denying the Motion to Dismiss the Appeals of Galijan and Smith**

Ehrenkranz's second argument contends that the trial court erred in denying his motion to dismiss the de novo appeals of Smith and Galijan.  He asserts the court incorrectly interpreted section 98.2, subdivision (b) (section 98.2(b)) to require only the Center to post an undertaking in the amount of the Labor Commissioner's award.  In Ehrenkranz's view, the statute also required Galijan and Smith to post the undertaking, which they failed to do.  We disagree.

Ehrenkranz's claims, which require the proper interpretation of a statute, and its application to undisputed facts of this case, present questions of law subject to de novo review.  (*Estate of Kampen* (2011) 201 Cal.App.4th 971, 985.)  "In construing a statute, our task is to ascertain the intent of the Legislature so as to effectuate the purpose of the enactment.  [Citation.]  We look first to the words of the statute, which are the most reliable indications of the Legislature's intent.  [Citation.]  We construe the words of a statute in

---

[6]    Because we are reversing the summary judgment based on the ministerial exception, we need not address Ehrenkranz's additional argument that the court should have considered whether his claims were barred under the "ecclesiastical abstention" doctrine (or church autonomy doctrine), another defense grounded in the Religion Clauses of the First Amendment.  (See *Lorenzo*, *supra*, 116 Cal.App.5th at p. 279.)

context, and harmonize the various parts of an enactment by considering the provision at issue in the context of the statutory framework as a whole." (*Cummins, Inc. v. Superior Court* (2005) 36 Cal.4th 478, 487.) " 'If the language is unambiguous, "then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." ' " (*Niedermeier v. FCA US LLC* (2024) 15 Cal.5th 792, 804.)

Under section 98.2, a party may appeal an award of the Labor Commissioner to the superior court "where the appeal shall be heard de novo." (§ 98.2, subd. (a).) If no notice of appeal is timely filed, the order is deemed the final order. (§ 98.2, subd. (d).) And as relevant here, section 98.2(b) provides in part: "As a condition to filing an appeal pursuant to this section, *an employer* shall first post an undertaking with the reviewing court in the amount of the order, decision, or award." (Italics added.)[7]

---

[7]    In its entirety, section 98.2(b) states: "As a condition to filing an appeal pursuant to this section, *an employer* shall first post an undertaking with the reviewing court in the amount of the order, decision, or award. The undertaking shall consist of an appeal bond issued by a licensed surety or a cash deposit with the court in the amount of the order, decision, or award. *The employer* shall provide written notification to the other parties and the Labor Commissioner of the posting of the undertaking. The undertaking shall be on the condition that, if any judgment is entered in favor of the employee, *the employer* shall pay the amount owed pursuant to the judgment, and if the appeal is withdrawn or dismissed without entry of judgment, the employer shall pay the amount owed pursuant to the order, decision, or award of the Labor Commissioner unless the parties have executed a settlement agreement for payment of some other amount, in which case *the employer* shall pay the amount that the employer is obligated to pay under the terms of the settlement agreement. If *the employer* fails to pay the amount owed within 10 days of entry of the judgment, dismissal, or withdrawal of the appeal, or the execution of a settlement agreement, a portion of the undertaking equal to the amount owed, or the entire undertaking if the amount owed exceeds the undertaking, is forfeited to the employee." (Italics added.)

22

This undertaking requirement is "mandatory and jurisdictional." (*Palagin v. Paniagua Construction, Inc.* (2013) 222 Cal.App.4th 124, 140 (*Palagin*).) Its "immediate purpose . . . is to provide assurance that a judgment in favor of the employee will be satisfied." (*Id.* at p. 130.) The "broader purpose of this provision . . . . is to 'discourage employers from filing frivolous appeals and from hiding assets in order to avoid enforcement of the judgment.' " (*Ibid.*)

The parties disagree on *who* was required to post the undertaking under section 98.2(b). Ehrenkranz contends that each of the three defendants was required to do so. Defendants counter that the trial court correctly determined that only the Center was required to post the undertaking, because it was Ehrenkranz's "putative employer." Thus, the question before us turns on the meaning of the term "employer" in the statute.

As an initial matter, Ehrenkranz does not assert that either Galijan or Smith was his employer. To the contrary, Ehrenkranz conceded below he "never was employed by, worked at or paid by . . . Galijan . . . or . . . Smith." However, as we understand it, Ehrenkranz's proposed interpretation of section 98.2(b) does not depend on a definition of the word "employer" in and of itself. Instead, his argument appears to rest primarily on inferences drawn from another Labor Code provision, section 558.1.

Section 558.1, subdivision (a) states: "Any employer *or other person acting on behalf of an employer*, who violates, or causes to be violated, any provision regulating minimum wages or hours and days of work in any order of the Industrial Welfare Commission, or violates, or causes to be violated, Sections 203, 226, 226.7, 1193.6, 1194, or 2802, *may be held liable as the employer* for such violation." (Italics added.) Section 558.1, subdivision (b)

23

provides that "For purposes of this section, the term 'other person acting on behalf of an employer' is limited to a natural person who is an owner, director, officer, or managing agent of the employer, and the term 'managing agent' has the same meaning as in subdivision (b) of Section 3294 of the Civil Code."

According to Ehrenkranz, "[t]he plain meaning of [section 558.1, subdivision (a)] is that such individuals must carry the liability obligations of the employer. One such obligation, under . . . section 98.2, subdivision (b), is that any wage claim defendant the Labor Commissioner finds liable as 'an employer' must post a bond to file an appeal of the Labor Commissioner's decision. . . ." As noted above, here the Labor Commissioner found that Smith and Galijan "were in charge of all three facilities at some point and made decisions as to how the facilities were ran" and, "[a]ccordingly, pursuant to . . . [section] 558.1, [Smith and Galijan] are liable as individuals, for Plaintiff's unpaid minimum wages, liquidated damages and waiting time penalties."[8] Defendants do not challenge those findings on appeal. Hence,

---

[8]     The Labor Commissioner did not make an express finding as to whether Galijan and Smith each qualified as an "other person acting on behalf of an employer" under section 558.1, subdivision (a), in that each was "an owner, director, officer, or managing agent of the employer" (§ 558.1, subd. (b)). Nor did the Commissioner find whether Galijan or Smith "violate[d], or cause[d] to be violated, any provision regulating minimum wages or hours and days of work in any order of the Industrial Welfare Commission, or . . . the [enumerated Labor Code sections]." (§ 558.1, subd. (a); see *Usher v. White* (2021) 64 Cal.App.5th 883, 896–897 [concluding that to be held liable under section 558.1, an owner, director, officer, or managing agent "must either have been personally involved in the purported violation of one or more of the enumerated provisions; or, absent such personal involvement, had sufficient participation in the activities of the employer, including, for example, over those responsible for the alleged wage and hour

24

Ehrenkranz argues that "under the plain language of . . . sections 558.1 and 98.2, subdivision (b), both Defendants Galijan and Smith were required to post a bond 'as the employer' to file an appeal of the Labor Commissioner's [Order]."

To sum it up, it appears that Ehrenkranz is impliedly asserting that Galijan and Smith each qualified as an "other person acting on behalf of an employer" under section 558.1, subdivision (b). And because they were found liable "as the employer" under section 558.1, subdivision (a), Ehrenkranz argues they were subject to all the obligations and liabilities of the employer, including the undertaking requirement in section 98.2(b).

A similar argument was made in *Lorenzo*, with which argument the appellate court agreed. (*Lorenzo*, *supra*, 116 Cal.App.5th at p. 282.) In construing section 98.2(b), *Lorenzo* began "by noting that section 98.2, subdivision (b), by its express terms, requires that *each* 'employer' post an undertaking '[a]s a condition to filing an appeal' from a Labor Commissioner's order. Thus, if Galijan and Smith are each deemed 'an employer' for purposes of section 98.2, subdivision (b), then they *each* had to post an undertaking covering the amount of the award in order to appeal from the portion of the Order adverse to them." (*Lorenzo*, at p. 281.) *Lorenzo* then noted that the Labor Commissioner found Galijan and Smith individually liable for the full amount awarded to Lorenzo under section 558.1, a finding that defendants did not dispute on appeal. (*Lorenzo*, at p. 282.) As such, *Lorenzo* concluded defendant "forfeited any argument that Galijan and Smith were not 'employer[s]' for purposes of their wage-and-hour violations." (*Ibid*.)

*Lorenzo* went on to hold that "[b]ecause Galijan and Smith were each

violations, such that the [owner, director, officer, or managing agent] may be deemed to have contributed to, and thus . . . 'cause[d]' a violation."].)

25

found liable as 'the employer' under section 558.1, they each should logically be deemed 'an employer' for purposes of section 98.2, subdivision (b)." (*Lorenzo*, 116 Cal.App.5th at p. 282.) In so holding, *Lorenzo* relied on the rule of construction that " ' " ' " 'identical words used in different parts of the same act are intended to have the same meaning.' " ' " ' " (*Ibid.*, quoting *People v. Roberge* (2003) 29 Cal.4th 979, 987.)

In their respondents' brief, defendants do not specifically respond to Ehrenkranz's arguments based on section 558.1. During oral argument, however, counsel for defendants asserted that while the Labor Commissioner found that Galijan and Smith were "liable as the employer" under section 558.1, that does not mean they were the "employer" for purposes of the undertaking requirement in section 98.2(b). Defendants also argue that Ehrenkranz's interpretation of the statute should be rejected because it would lead to the "absurd" result of mandating that the undertaking should "somehow be three times the amount of" the Labor Commissioner's award. (Italics omitted.)

Taking up the arguments in reverse order, defendants' second assertion based on "absurd" results is unavailing. As Ehrenkranz explains in his briefing, he has never argued that defendants were required to post "three times the amount" of the Labor Commissioner's award; instead, his argument is that the Center, Galijan, and Smith "could have posted a single, joint bond in the amount of the Labor Commissioner's Award . . . , which would have been sufficient to support all three of their appeals"—a position his counsel expressly acknowledged at oral argument.

That said, defendants' counsel's challenge to Ehrenkranz's reliance on section 558.1 is well taken. As we now explain, the plain language of section 98.2(b) does not support Ehrenkranz's—and thus *Lorenzo*'s—interpretation of

26

the statute.

First, we do not start from the same premise as *Lorenzo* that, as the court put it, section 98.2(b) "by its express terms, require[ ] that *each* 'employer' post an undertaking '[a]s a condition to filing an appeal' from a Labor Commissioner's order." (*Lorenzo*, *supra*, 116 Cal.App.5th at p. 282.) Section 98.2(b) does not state that "*each* employer" shall post the undertaking; it only states that "*an* employer" shall post the undertaking. (Italics added.)

Beyond that, we do not find any language in section 98.2 that supports Ehrenkranz's interpretation. Section 98.2 makes no reference to section 558.1. Nor does section 98.2 include any language indicating an intent to require any person other than "an employer"—such as any "other person acting on behalf of an employer" held liable under section 558.1 or an owner, director, officer, or agent of the employer—to post the undertaking.[9] As we have put it, "a cardinal rule of statutory construction[ ] [is] that it is not a judicial function to read into statutes language the Legislature might have used or might have intended. [Citations.] In other words, courts do not rewrite statutes." (*Podiatric Medical Bd. of California v. Superior Court* (2021) 62 Cal.App.5th 657, 674–675.) That seems to be what Ehrenkranz is asking us to do here. If the Legislature desired to require any "other person acting on behalf of an employer" found "liable as the employer" under section 558.1 to post the undertaking in section 98.2(b), "it could have easily said so."

_____

[9] Section 98.2(b) was added to the Labor Code in 2000 (Assem. Bill No. 2509 (1999–2000 Reg. Sess.); Stats. 2000, ch. 876, § 2), and amended in 2010 to state as it now reads (Assem. Bill No. 2772 (2009–2010 Reg. Sess.); Stats. 2010, ch. 102, § 1)—which events occurred before section 558.1 was added to the Labor Code. (Senate Bill No. 588 (2015–2016 Reg. Sess.), effective Jan. 1, 2016.)

27

(*Riverside County Sheriff's Dept. v. Stiglitz* (2014) 60 Cal.4th 624, 632.)  For example, it could have defined "employer" to "include" such individuals.  (See, e.g., Gov. Code, § 12926, subd. (d) [for purposes of the Fair Employment and Housing Act, the term " '[e]mployer' *includes* any person regularly employing five or more persons, *or any person acting as an agent of an employer, directly or indirectly*," italics added].)  The Legislature did not do so.

Our conclusion that the plain language does not support Ehrenkranz's interpretation finds further support when considering that in a neighboring provision, section 98, there is a specific reference to section 558.1 and the phrase "other person acting on behalf of an employer," but no such reference in section 98.2.  Effective January 1, 2016, Senate Bill No. 588 (Reg. Sess. 2015–2016) added section 558.1 to the Labor Code and amended other sections of the Labor Code, including section 98, which describes the Berman hearing process.  (Stats. 2015, ch. 803, §§ 3, 10.)  The bill amended section 98 to additionally state that "[t]he Labor Commissioner may also provide for a hearing to recover civil penalties due pursuant to Section 558 against any employer or *other person acting on behalf of an employer*, including, but not limited to, an individual liable pursuant to Section 558.1."[10]  (Stats. 2015, ch. 803, § 3, italics added.)  That the Legislature amended section 98 to expressly refer to section 558.1 and the phrase "other person acting on behalf of the employer" while leaving section 98.2 silent on that front strongly suggests that it intended not to require anyone other than the "employer" to post the appeal bond in section 98.2.  (See, e.g., *Krug v. Board of Trustees of California*

---

[10]     Section 558, subdivision (a) states:  "Any employer or other person acting on behalf of an employer who violates, or causes to be violated, a section of this chapter or any provision regulating hours and days of work in any order of the Industrial Welfare Commission shall be subject to a civil penalty . . . ."

28

*State University* (2025) 110 Cal.App.5th 234, 243–244 [holding that section 2802, which requires "an employer" to cover "necessary expenditures" for a job, did not include public employers, based in part on the fact that the Legislature had added or amended several neighboring statutes to make them expressly applicable to both public and private employers, "while leaving section 2802 silent on that front."].)

For the above reasons, we do not find apt the rule of construction applied by *Lorenzo* that " ' " ' " 'identical words used in different parts of the same act are intended to have the same meaning.' " ' " ' " (*Lorenzo, supra,* 116 Cal.App.5th at p. 282, quoting *People v. Roberge, supra,* 29 Cal.4th at p. 987.) " '[T]he presumption that "identical words used in different parts of the same act are intended to have the same meaning . . . readily yields whenever there is such various in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act within different intent." ' " (*Reilly v. Marin Housing Authority* (2020) 10 Cal.5th 583, 591, quoting *Roberts v. Sea-Land Services, Inc.* (2012) 566 U.S. 93, 108; see, e.g., *United States v. Cleveland Indians Baseball Co.* (2001) 532 U.S. 200, 213 [phrase "wages paid" means different things in different parts of Title 26 of the United States Code]; *Robinson v. Shell Oil Co.* (1997) 519 U.S. 337, 343–344 [term "employee" means different things in different parts of Title VII].)

Here, sections 98.2(b) and 558.1 do not contain "identical words"; there is a variation in the connection in which the word "employer" is used in each statute. Section 98.2(b) uses the terms "an employer" and "the employer." Section 558.1 distinguishes between "employer" and "other person acting on behalf of an employer" in subdivision (a), and then sets forth a specific definition of the latter phrase in subdivision (b). While the latter person

29

"may be held *liable as the employer*" for certain Labor Code violations
(§ 558.1, subd. (a), italics added), the inclusion of a definition of "other person
acting on behalf of an employer" (*id.*, subd. (b)) indicates such a person is
intended to be distinct from the "employer" itself.  Thus, we do not believe
that the presumption based on "identical words" is applicable when
comparing sections 98.2(b) and section 558.1.

In short, we conclude that the plain language of section 98.2(b) does not
support Ehrenkranz's position that an individual held "liable as the
employer" under section 558.1 is required to post the undertaking in section
98.2(b).

Having determined what "employer" in section 98.2(b) does *not* mean,
we proceed to determine what it does mean.

Section 98.2 does not define the term "employer."  Neither does the
Labor Code.  (*McClean v. State of California* (2016) 1 Cal.5th 615, 627.)  But
all of the currently applicable Industrial Welfare Commission's wage orders[11]
use the same definition of the terms "employer" and "employ."  (*Vazquez v.
Jan-Pro Franchising International, Inc.* (2021) 10 Cal.5th 944, 950.)  For
example, Wage Order No. 5-2001—which concerns the public housekeeping
industry and which Ehrenkranz alleges was violated here—provides that
" '[e]mployer' means any person as defined in Section 18 of the Labor Code,
who directly or indirectly, or through an agent or any other person, employs
or exercises control over the wages, hours, or working conditions of any
person." (Cal. Code Regs., tit. 8, § 11050, subd. 2(E).)  The referenced section

___

[11]     The wage orders fix the minimum wage (*Dynamex Operations West,
Inc. v. Superior Court* (2018) 4 Cal.5th 903, 936, fn. 14 (*Dynamex*)) and "are
constitutionally authorized, quasi-legislative regulations that have the force
of law" (*id.*, at p. 914, fn. 3).  Although the Legislature defunded the
Commission in 2004, its wage orders remain in effect.  (*Id.* at p. 936, fn. 14.)

18, in turn, defines "person" as "any person, association, organization, partnership, business trust, limited liability company, or corporation." And the Wage Order further states that " '[e]mploy' means to engage, suffer, or permit to work." (Cal. Code Regs., tit. 8, § 11050, subd. 2(F).) Our Supreme Court has interpreted this standard to consist of three alternatives: "(a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." (*Martinez*, *supra*, 49 Cal.4th at p. 64 [interpretating Wage Order No. 14-2001, which contains the same definitions of "employ" and "employer" as Wage Order No. 5-2001 (Cal. Code Regs., tit. 8, § 11140, subds. 2(C) & (F)].)

The first standard is self-explanatory. (*Medina v. Equilon Enterprises, LLC* (2021) 68 Cal.App.5th 868, 874.) The second standard, to suffer or permit to work, is broad; it is triggered when an employer merely " 'permit[s]' " unlawful labor " 'by acquiescence' " or suffers the unlawful labor by " 'fail[ing] to hinder' " it. (*Martinez*, *supra*, 49 Cal.4th at p. 58; *Dynamex*, *supra*, 4 Cal.5th at p. 953.) Put differently, "the basis of liability is the defendant's knowledge of and failure to prevent the work from occurring." (*Martinez, supra,* at p. 69.) The third standard, to engage, means to "creat[e] a common law employment relationship." (*Martinez*, at p. 64.) "The essence of the common law employment test 'is the "control of details"—that is, whether the principal has the right to control the manner and means by which the worker accomplishes the work." (*Curry v. Equilon Enterprises, LLC* (2018) 23 Cal.App.5th 289, 304.)[12]

---

[12] "[T]here are a number of additional factors in the modern equation [of this test], including (1) whether the worker is engaged in a distinct occupation or business, (2) whether, considering the kind of occupation and

As noted above, section 98.2 authorizes a party to appeal from the Labor Commissioner's order, award, or decision made pursuant to section 98.1. (§ 98.2, subd. (a).) And such decision is made pursuant to section 98, which authorizes the Labor Commissioner to investigate complaints and hold a hearing "in any action to recover wages, penalties, and other demands for compensation, including liquidated damages if the complaint alleges payment of a wage less than the minimum wage fixed by an order of the Industrial Welfare Commission or by statute, properly before the division or the Labor Commissioner, including orders of the Industrial Welfare Commission, and shall determine all matters arising under his or her jurisdiction." (§ 98, subd. (a).) When reading section 98.2 together with its neighboring provisions, we conclude that the definition of "employer" provided in the wage orders applies to the term "employer" in section 98.2(b).

Here, the parties apparently agree that the Center was Ehrenkranz's "employer." As noted above, Ehrenkranz does not allege that Galijan or Smith was his employer. Thus, applying the plain meaning of section 98.2(b) to this case, only the Center was required to post the undertaking, which it did. Accordingly, the trial court correctly determined that Galijan and Smith did not also have to post an undertaking in order to appeal the Labor Commissioner's award.

Ehrenkranz's counterarguments do not persuade us to depart from the

---

locality, the work is usually done under the principal's direction or by a specialist without supervision, (3) the skill required, (4) whether the principal or worker supplies the instrumentalities, tools, and place of work, (5) the length of time for which the services are to be performed, (6) the method of payment, whether by time or by job, (7) whether the work is part of the principal's regular business, and (8) whether the parties believe they are creating an employer-employee relationship. [Citations.]" (*Curry v. Equilon Enterprises, LLC, supra,* 23 Cal.App.5th at pp. 304–305.)

plain language of section 98.2(b).  He argues that "the trial court's finding—that individuals found liable 'as the employer'—have no appeal bond obligation—is unworkable and runs directly counter to the Legislature's intent of ensuring workers recover their wages."  He goes on:  "Under the trial court's rule, an employee could be dragged through an appeal without any collection assurance.  This is exactly the situation the legislature sought to avoid by enacting Labor Code sections 558.1 and 98.2, subdivision (b), both of which were intended to help workers collect wages found owed to them."

In essence, Ehrenkranz asserts that accepting the trial court's interpretation of section 98.2(b) would contravene the legislative purposes of both statutes and/or lead to absurd results.  To avoid that outcome, he argues that we should construe section 98.2(b) to require not just employers, but also individuals held liable "as the employer" under section 558.1, to post the undertaking in order to appeal a Labor Commissioner's award.

Similar concerns were expressed in *Lorenzo*, which concluded that accepting an interpretation like the trial court's here "would frustrate the objectives of both [sections 98.2 and 558.1]."  (*Lorenzo*, *supra*, 116 Cal.App.5th at p. 283.)  It illustrated this point by presenting a hypothetical:  "if individuals found liable under section 558.1 are not subject to the undertaking requirement, then there may be an appeal . . . with no bond to cover the employer's potential liability because the employing entity may be judgment proof and therefore choose not to appeal.  In that situation, the appeal would increase the costs for vulnerable workers without any repercussions for the individuals already found liable under section 558.1.  Moreover, the risk of nonrecovery by those workers would increase dramatically because those individuals would have greater opportunity to hide their assets during the appeal."  (*Lorenzo*, at p. 283.)

33

It is true that "[w]e need not follow the plain meaning of a statute when to do so would 'frustrate[ ] the manifest purposes of the legislation as a whole or [lead] to absurd results.' " (*California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333, 340; see also *In re D.B.* (2014) 58 Cal.4th 941, 948 ["To justify departing from a literal reading of a clearly worded statute, the results produced must be so unreasonable the Legislature could not have intended them."].)  While Ehrenkranz and the court in *Lorenzo* have identified concerns as to the potential impacts of the plain meaning interpretation of section 98.2, we believe they fall short of showing that we should effectively rewrite the statute by construing it to include a requirement that the Legislature did not put there.

For one, the outcome Ehrenkranz posits does not necessarily follow from the trial court's interpretation of section 98.2.  This very case presents a counterexample.  Here, the employer has posted an undertaking in the entire amount of the judgment awarded to the employee.  Thus, even if the individuals who had been found liable under section 558.1 were not required to, and did not, post the undertaking, the employee has received the assurance that the judgment will be satisfied.  In other words, upholding the trial court's interpretation here is consistent with the legislative purposes of section 98.2.

We do not doubt that requiring individuals found liable under section 558.1 to also post the undertaking in section 98.2(b) could enhance the deterrence of intentional wage nonpayment.  However, it is plausible that when the Legislature enacted section 98.2(b), it believed that such goal could be accomplished by imposing the undertaking requirement on employers, rather than individuals acting on the employers' behalf.

The Legislature enacted section 98.2(b) in response to California's

34

"large and growing 'underground economy' of employers who are chronic violators of wage and hour, safety, and tax laws." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2509 (1999–2000 Reg. Sess.).) "Such employers pay cash under the table or with checks that bounce, fail to report and pay employment taxes, work their employees long hours without rest breaks, and avoid paying wage judgments issued against them." (*Ibid*.) As explained in legislative history materials for the 2010 amendment of section 98.2(b), section 98.2(b) was enacted in 2000 in response to "unscrupulous employers, particularly those in the underground economy, [that] were filing 'frivolous' appeals of [Labor Commissioner] decisions with the superior court in an effort to drag out litigation and hide assets so that workers would not be able to collect on judgments, even if ultimately successful on appeal." (Assem. Com. on Labor and Employment, Analysis of Assem. Bill No. 2772 (2009–2010 Reg. Sess.), as amended on April 8, 2010.)

The Legislature's apparent solution to this problem was to require employers, as opposed to individuals acting on the employers' behalf, to bear the obligation of posting an undertaking in order to appeal a Labor Commissioner's decision. The Legislature could have reasonably presumed that when an employer engages in the improper manipulation of assets described above, the employing entity itself is properly charged with that misconduct. (See *Curci Investments, LLC v. Baldwin* (2017) 14 Cal.App.5th 214, 851 [corporate entities are presumed to have existences separate from their stockholders, officers, and directors; the same is true of a limited liability company and its members and managers].) The Legislature also could have believed that the normally deep-pocketed employer would likely have more resources at its disposal, and thus be in a better position, to post the bond (a) in the entire amount of the award, so as to cover itself and any

35

jointly and severally liable individual defendants, and (b) in the short 10-day time frame to do so (see *Palagin*, *supra*, 222 Cal.App.4th at p. 131; § 98.2, subd. (a))—and therefore to provide the assurance that a judgment in favor of the employee would be satisfied. Moreover, the Legislature could have also thought that in the usual case, the plaintiff-employee's primary target remains the employer, even though the employee may in certain circumstances enforce personal liability on individuals acting on behalf of the employer for wage violations. Considering these circumstances, it is at least plausible the Legislature thought it best that the employer should bear the obligation of posting the undertaking requirement in section 98.2(b).

Finally, we observe that accepting Ehrenkranz's interpretation would produce an incongruous result in this particular case. As Ehrenkranz's counsel explained during oral argument, a reversal of the denial of Ehrenkranz's motion to dismiss Galijan's and Smith's appeals would invalidate those appeals and render the Labor Commissioner's award against them final. Meanwhile, the Center would be able to proceed with the appeal and, if necessary, proceed to trial, during which it could present evidence to establish the ministerial exception applies to bar Ehrenkranz's wage claims. Thus, the Center would have the opportunity to pursue and establish a complete defense to liability for the wage violations, while the individual defendants would not, despite having been found "liable as the employer" for the same wage violations.

In sum, under the plain language of section 98.2(b), the Center, and not Galijan and Smith, was required to post the undertaking. Because the Center did so, the trial court properly concluded the undertaking requirement was met. Therefore, it properly denied Ehrenkranz's motion to dismiss the appeals of Galijan and Smith.

## DISPOSITION

We reverse the judgment and the trial court's order granting summary judgment for defendants. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.

_____

RICHMAN, ACTING P.J.

We concur.

_____

MILLER, J.

_____

DESAUTELS, J.

(A171527P)

38

San Francisco County Superior Court

Honorable Rochelle East

Counsel:

Theresa Bichsel for Plaintiff and Appellant.

Clarkson Law Firm, Glenn A. Danas and Brent A. Robinson for California Employment Lawyers Association and National Employment Law Project as Amici Curiae on behalf of Appellant.

Foley & Lardner, Eileen R. Ridley, Evan L. Hamling, Jack R. Doti and Sara Alexis Levine Abarbanel for Defendants and Respondents.